UNITED STATES DISTRICT COURT
FOR THE
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| KAMAL MUZAFFAR, M.D., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>AURORA HEALTH CARE SOUTHERN )<br>LAKES, INC., )<br>)<br>Defendant. ) | Civil Action No. 13-CV-744 |

**AFFIDAVIT OF TODD M. WEIR IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

STATE OF WISCONSIN )
                             )SS
WAUKESHA COUNTY )

      Todd M. Weir being first duly sworn on oath deposes and states as follows:

      1.      That he is one of the attorneys for the defendant, Aurora Health Care Southern Lakes, Inc., and makes this Affidavit upon personal knowledge and in support of the foregoing Motion for Summary Judgment.

      2.      That attached hereto as ***Exhibit A*** is a letter dated October 27, 2011, from counsel for Dr. Muzaffar to Ms. Carrie Norbin Killoran, VP & Chief Compliance Officer of Aurora Health Care, Inc., alleging that the actions taken by the Medical Executive Committee in July of 2010, with regard to Dr. Muzaffar, "were taken in retaliation against him after he reported possible EMTALA violations to the MEC." (P. 2 last paragraph).

      3.      That attached hereto as ***Exhibit B*** are plaintiff's responses to defendant's First Request for Production of Documents. Request No. 20 seeks copies of any and all documents establishing or relating to or supporting the claim that Dr. Muzaffar reported certain other

hospital transfers which violated EMTALA as alleged in ¶ 28 of plaintiff's Second Amended Complaint.

4. That attached hereto as *Exhibit C* are documents 24 through 66 produced by Dr. Muzaffar in response to Request No. 20. None of the documents reference any hospital transfers in 2011, as alleged in ¶ 28 of plaintiff's Second Amended Complaint.

5. That when questioned regarding the patients referenced in ¶ 28 of plaintiff' Second Amended Complaint, after first being duly sworn on oath, on September 18, 2014, Dr. Muzaffar was asked the following questions and gave the following responses:

**Page 97**

Q   Getting back to the complaint, Paragraph 28 says, "In 2011, Aurora failed to respond when Dr. Muzaffar reported that certain other hospital

**Page 98**

transfers violated EMTALA."

Do you have any documents regarding those patients?

A   I have them in my possession, yes. But I - -

Q   What documents do you have?

A   There are two incidents, and they both pertain to the same ED doctor, which I mentioned with you I discussed with Cary Berkowitz about. And one of the patients, who was a patient at what was then Mount Carmel Nursing Home, who had been discharged from Lakeland Hospital, became my patient when they were admitted to Mount Carmel. Upon landing at Mount Carmel, wanted to go back to the hospital.

And the ER physician called me and said, why are you sending this patient to the hospital, to the emergency room? And I said, I am not sending the patient. The patient wants to go. I cannot stop the patient from going. If they choose to go, that's their legal right.

And I said, you know, this is an EMTALA violation. You're actually preventing a patient from seeking help in the emergency room by asking me to stop the patient.

2

The patient - - the physician was very rude to me the entire discussion. I said, I have

**Page 99**

no recourse over this matter. You are, unfortunately, going to have to see the patient, decide what you want to do with them.

Q   Who was this emergency room doctor?

A   Dubovoy.

Q   And where was he at the time?

A   It was a she. It's at the Lakeland Hospital Emergency Room. And I notified Dr. Berkowitz of it, because I had been told that he's my point person for such matters.

Q   I'm not understanding this situation, so I need you to go through it again. Okay?

A   Please.

Q   The patient is where? Take me through where the patient went physically.

A   Patient initially was admitted to Lakeland Medical Center under the care of a hospitalist. She was discharged from the hospital. And after that, for a short-term rehab, she came to Mount Carmel, which is an nursing home, a skilled nursing facility - -

Q   Right.

A   - - for a short-term rehab.

When the patients go to that facility, they automatically get assigned to me, because I'm the medical director over there. So when she comes

**Page 100**

to my service over there, she wanted immediately to go back to the hospital because she was not feeling well.

The ambulance was called, and the patient was en route to being transferred. And Dr. Dubovoy called me, in essence, to prevent that transfer from happening.

And I tried to explain to her that it's not up to me to stop the patient from going to the hospital. That's their legal right. And it was a very extensive and very bitter discussion.

Q   And was the patient ultimately readmitted at Lakeland?

A   I have no idea. She went to Lakeland, but I - - she was a loss to follow for me.

Q   You mentioned you had some records, though, regarding - -

A   I have the records from the nursing home where she was at. Those records I do have, yes, but they are privileged. I do not - -

Q   I'm not going to ask for the records.

A   Okay.

Q   So there's one patient that is the subject of Paragraph 28?

A   There was another patient.

**Page 101**

Q   What's the other one?

A   This was a patient of Dr. Poplar's, who had come in with shortness of breath, and Dr. Dubovoy wanted this person admitted to Lakeland Hospital. I said, I agree the patient needs to be admitted to the hospital, but she's too sick for Lakeland Hospital. She needs to be transferred to St. Luke's because she is very ill.

   Dr.Dubovoy refused to transfer the patient. The patient was still in the emergency room, so technically, that was her patient; it wasn't my patient.

   I was consulted to evaluate the patient. I evaluated the patient. I told them that this patient is not going to do well. She refused to transfer the patient. So I had to do her job, and I had to transfer the patient myself to St. Luke's. The patient subsequently died at St. Luke's.

Q   So you became involved and transferred the patient.

A   I had to transfer the patient because the physician who was legally responsible for transferring the patient refused to transfer the patient.

Q   Have we now covered all the patients that are the subject of Paragraph 28?

A   Yes, these are the two.

**Page 102**

Q       You reported the first patient, who had been discharged to Mount Carmel and wanted to go back to the ER, you reported that issue to Dr. Berkowitz?

A       Yes.

Q       Did you ever put anything in writing about that patient?

A       No. I was told that the reason all this wrath fell on me was because I wrote a letter.

Q       Other than Dr. Berkowitz, did you report this first patient - - the Mount Carmel patient we'll call this patient, so you're tracking with me?

A       Sure.

Q       - - did you report that to anybody else?

A       To the State, you mean?

Q       Anybody else.

A       No.

Q       In 2011, what was Dr. Berkowitz's role, if you know, with Aurora?

A       He was their staff cardiologist.

Q       Do you know if he was employed by Aurora?

A       Yeah, he's employed by Aurora.

Q       He's an employed physician?

A       I think so.

Q       What about the second patient? We'll call this patient the patient that ultimately went to

**Page 103**

St. Luke's. Who did you report that to?

A       To Cary Berkowitz.

Q       Anybody else?

A       Cary Berkowitz, to my knowledge, carried this on to Batesky, who is the ED chief. He said he was going to look into the matter, but I never heard from them.

Q   Nothing in writing about the second patient - -

A   No.

Q   - - the St. Luke's patient?

    So you reported it to - -

A   Verbally.

Q   - - Berkowitz verbally.  Did you ever hear back from him?

A   No.  I pursued that later, and I said, you know, I haven't heard from you.  And then I got a call from Berkowitz saying that he was going to look into that, but he never did call me with any resolution of what happened.

    6.   That after first being duly sworn on oath, Dr. Cary Berkowitz, was asked the

following questions and gave the following answers on November 26, 2014.

**Page 30**

Q   Sure.  One of the instances involved a patient that had been transferred from Lakeland to Mount Carmel nursing home.  And that patient, upon transfer to Mount Carmel nursing home, wanted to go back to Lakeland.  And Dr. Muzaffar had some discussions with Dr. Dubovoy, D-U-B-O-V-O-Y.  Do you recall that?

A   Not specifically.

Q   Do you recall anything about the incident?

A   Not that particular incident.

**Page 31**

Q   Then there was a second incident that Dr. Muzaffar talked about in his deposition also involving Dr. Dubovoy - - I don't know if I'm pronouncing that right - - Dr. Dubovoy?

A   Dubovoy.

Q   Dubovoy.  Thank you.

    Do you know Dr. Dubovoy?

A   Yes.

Q	And this particular patient was a patient of Dr. Poplar's who had come into Lakeland with shortness of breath and was admitted to Lakeland Hospital, and Dr. Muzaffar thought that the patient needed to be transferred to St. Luke's because he was too sick for Lakeland Hospital and Dr. Dubovoy refused to transfer the patient. Do you recall having discussions with Dr. Muzaffar about that incident?

A	No.

Q	Do you recall any specific instances where you discussed patient transfer issues with Dr. Muzaffar after July 2010?

A	I can't give you any specific examples. We talked multiple times. I didn't keep any records of it. He came to me or I would meet him and he would talk about a case. And most of the, I would look

**Page 32**

at it and I would talk to - - I would look at the emergency room records and I would talk to Dr. Batesky, who was in charge of the emergency room, and we would look at the case.

Q	Would you then go back and discuss the results of your review of the case with Dr. Muzaffar?

A	Yes.

Further affiant sayeth not.

                                                      _s/Todd M. Weir_____
                                                      Todd M. Weir
                                                      State Bar No: 1010442

Subscribed and sworn to before me
this 30th day of April, 2015.


s/Jason J. Franckowiak_____
State of Wisconsin, Waukesha County
My Commission is Permanent