## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

KAMAL MUZAFFAR, M.D.,

        Plaintiff,

    -vs-                                   File No. 13-CV-744-NJ

AURORA HEALTH CARE SOUTHERN LAKES, INC.,

        Defendant.

## PLAINTIFF'S CONSOLIDATED STATEMENT OF FACTS
## OPPOSING DEFENDANT'S SUMMARY JUDGMENT MOTIONS

**NOW COMES** Plaintiff, Kamal Muzaffar, M.D. ("Dr. Muzaffar"), by his attorneys, Godfrey, Leibsle, Blackbourn & Howarth, S.C., and submits the following consolidated statement of facts in opposition to Defendant, Aurora Health Care Southern Lakes, Inc.'s ("Aurora") four pending summary judgment motions:

    a.        Motion for Summary Judgment (Re: Statute of Limitations) (R. Doc. 70);

    b.        Motion for Partial Summary Judgment Dismissing Plaintiff's Claims for Damages Related to Alleged Refusal of the Defendant to Provide Dr. Muzaffar with Access to Aurora EPIC (R. Doc. 73);

    c.        Motion for Summary Judgment (R. Doc. 84); and

    d.        Motion for Summary Judgment Based On the Failure of Proof Regarding Damages (R. Doc. 81).

1

## Dr. Muzaffar's Membership in the Aurora Network

1.     Aurora operates a network of health care providers ("Aurora Network") that contract to provide services to health insurance plans that contract with the Aurora Network. (Blackbourn Aff.[1] Ex. A at 8:15-24, 18:11-18; Muzaffar Aff.[2] Ex. A.)

2.     The Aurora Network is Aurora's insurance plan.  Aurora has 42 delegated health care payors that it has contracted with.  These 42 delegated payors are periodically provided with a list of physicians and other health care providers who have been credentialed by Aurora to participate in the Aurora Network.  (Blackbourn Aff. Ex. B at 4:15-23.)

3.     The Aurora Network has existed since at least 1995.  (Blackbourn Aff. Ex. B at 8:7-21.)

4.     The Aurora Network has changed names.  It was known as Aurora Health Network, then Aurora Direct Care Network, then Aurora Accountable Care Network.  It is now known as the Aurora Network.  (Blackbourn Aff. Ex. B at 12:17-13:2.)

5.     Dr. Muzaffar became a contract provider in the Aurora Network in 2002. (Blackbourn Aff. Ex. B at 8:7-18 (Dr. Muzaffar previously in the network).)

6.     Dr. Muzaffar's contract with the Aurora Network had a two-year term that automatically renewed unless one party or the other terminated the contract.  (Muzaffar Aff. Ex. A, § 4.a.)

7.     Aurora could terminate the contract only on one year's notice, or if Dr. Muzaffar failed to perform an obligation and did not correct the failure within 30 days of notice,

---

[1] Affidavit of Attorney Lisle W. Blackbourn Opposing Defendant's Motions for Summary Judgment ("Blackbourn Aff."), filed herewith.
[2] Affidavit of Kamal Muzaffar, M.D. Opposing Defendant's Motions for Summary Judgment ("Muzaffar Aff."), filed herewith.

or under specific circumstances of which there is no evidence in the record. (Muzaffar Aff. Ex. A, § 4.b.)

## Dr. Muzaffar's 2009 EMTALA Report

8. On October 20, 2008, a patient, R.C., came to the Aurora Lakeland Medical Center ("Aurora Lakeland") emergency department and was diagnosed with congestive heart failure. (Blackbourn Aff. Ex. C at Bates No. 3001.)

9. The Aurora Lakeland emergency department consulted with Dr. Muzaffar about R.C.'s case because Dr. Muzaffar was on call. (*Id.*) Dr. Muzaffar declined to accept R.C. to his service because he believed this patient needed immediate cardiology and cardiothoracic surgery consultation, services not available at Aurora Lakeland. (Blackbourn Aff. Ex. C at Bates No. 6008.) Dr. Muzaffar advised the Aurora Lakeland emergency department physician to consult with an on-call cardiologist. (*Id.*)

10. The Aurora Lakeland emergency department recommended that R.C. transfer to Aurora St. Luke's Medical Center, a higher-level care facility affiliated with Aurora, but R.C. refused the recommended transfer because he had VA benefits. (Blackbourn Aff. Ex. C at Bates No. 3001.) R.C. also refused to transfer to a VA hospital in Madison. (*Id.*) The Aurora Lakeland emergency department physician later found an open bed at the VA hospital in Milwaukee, Wisconsin, and R.C. agreed to transfer to that facility. (*Id.*) R.C. died in transit to the Milwaukee VA Hospital. (*Id.*)

11. On November 6, 2008, the Aurora Lakeland Practitioner Chart Review Committee ("Chart Review Committee") provided Dr. Muzaffar with a chart review form

3

concerning his involvement in R.C.'s case, and Dr. Muzaffar was asked to provide a written response.  (Blackbourn Aff. Ex. C at Bates No. 6005.)

12.     On November 9, 2008, Dr. Muzaffar provided his written response concerning R.C. to the Chart Review Committee.  (Blackbourn Aff. Ex. C at Bates No. 6008.) Dr. Muzaffar explained that he had declined to accept R.C. to his service because the immediate medical needs of R.C. exceeded the scope of Dr. Muzaffar's specialty.  (*Id.*)  Dr. Muzaffar explained that in his opinion admission of R.C. to Aurora Lakeland would not have been in R.C.'s best interest because of the critical nature of R.C.'s illness.  (*Id.*)  Dr. Muzaffar explained that he had consulted with the Aurora Lakeland emergency department and advised that R.C. should be transferred to either Aurora St. Luke's Medical Center or a V.A. hospital, where R.C. could receive appropriate care.  (*Id.*)  Dr. Muzaffar stated that he had seen R.C. at Aurora Lakeland, notwithstanding the Chart Review Committee's accusation that he had refused to come to the hospital.  (*Id.*)

13.     Dr. Muzaffar received a letter from the Chart Review Committee in June 2009, accusing him of failing to meet a standard of care in the R.C. case.  (Blackbourn Aff. Ex. C at Bates No. 6024.)

14.     Dr. Muzaffar responded to the Chart Review Committee in July 2009. (Blackbourn Aff. Ex. C at Bates No. 6025.)  Dr. Muzaffar pointed out that he had raised concerns about the actions of Dr. Batesky, who was the Aurora Lakeland emergency room physician involved in R.C.'s case.  (*Id.*)  Dr. Batesky was one of the members of the Chart Review Committee reviewing R.C.'s case.  (*Id.*)  Dr. Muzaffar objected that the committee could not act impartially with Dr. Batesky on the committee.  (*Id.*)

4

15.     On August 10, 2009, Dr. Muzaffar wrote to the Aurora Lakeland Medical Executive Committee and expressed his opinion that the R.C. case had poor outcome because the Aurora Lakeland emergency department failed to properly advise R.C. about the risks and benefits of a transfer, or that staying at Aurora Lakeland could endanger R.C.'s life. (Blackbourn Aff. Ex. C at Bates No. 6032-33.) Dr. Muzaffar expressed his opinion that these failures constituted violations of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd. (*Id.*) Dr. Muzaffar recommended that the Medical Executive Committee adopt a procedure to ensure future compliance with EMTALA. (*Id.*)

16.     In October 2009, the Chart Review Committee informed Dr. Muzaffar that it was sending the R.C. case to an outside peer review physician for an opinion. (Blackbourn Aff. Ex. C at Bates No. 6035.)

17.     Six months later, in April 2010, Dr. Muzaffar received another letter from the Chart Review Committee criticizing Dr. Muzaffar for refusing to come to Aurora Lakeland to see R.C. (Blackbourn Aff. Ex. C at Bates No. 6040.) This was in spite of the fact that Dr. Muzaffar had told the Chart Review Committee that he had seen the patient (Blackbourn Aff. Ex. C at Bates No. 6008), and the independent reviewer had found that it was the cardiologist, not Dr. Muzaffar, who had failed to see R.C. (Blackbourn Aff. Ex. C at Bates No. 6036, 6038 (6036 is typed version of reviewer's comments found on 6038).)

## The 2010 Mercy Walworth Transfers

18.     Six months later, on the night of February 13-14, 2010, Dr. Muzaffar was on call at Aurora Lakeland, covering for a colleague, Dr. Clifford Poplar.  (Blackbourn Aff. Ex. D at Bates No. 89, Ex. K at 49:16-25.)

19.     During the night of February 13-14, 2010, Dr. Muzaffar received a phone call from Dr. Mark S. Gibson, an emergency room physician at Mercy Walworth Hospital & Medical Center ("Mercy Walworth"), requesting to transfer one of Dr. Clifford Poplar's patients, S.S., to Aurora Lakeland.  (Muzaffar Aff. ¶ 4.)

20.     Dr. Muzaffar advised Dr. Gibson that he was familiar with S.S., who was a pancreas transplant patient.  (Muzaffar Aff. ¶ 5.)  Dr. Muzaffar asked Dr. Gibson to check to see if S.S. could be cared for at Mercy Walworth. (*Id.*; Blackbourn Aff. Ex. K at 61:10-16.)  Dr. Gibson said he would check with Mercy Walworth's hospitalist physician and call back. (Muzaffar Aff. ¶ 5.)

21.     In a second phone call that night, Dr. Gibson told Dr. Muzaffar that S.S. had high blood sugar and needed care in an ICU, and Mercy Walworth had no ICU.  (Muzaffar Aff. ¶ 6.)  Dr. Gibson also told Dr. Muzaffar that S.S. had complained of symptoms she felt were similar to those she previously experienced when her transplanted pancreas was rejected.  (*Id.*, Ex. D.)

22.     Dr. Muzaffar had no qualifications to treat an organ rejection patient and told Dr. Gibson he felt S.S. should be transferred to the Mercy Hospital in Janesville, Wisconsin ("Mercy Janesville"), where she could be treated by an endocrinologist.  (Muzaffar Aff. ¶ 7.)

6

23.     In a third phone conversation, Dr. Gibson insisted that S.S. be transferred to the care of her primary physician at Aurora Lakeland, even though Dr. Muzaffar was only filling in for S.S.'s primary physician, Dr. Poplar.  (Muzaffar Aff. ¶ 8.)

24.     Due to his concern that S.S. was suffering from organ rejection, Dr. Muzaffar feared that S.S. was not in stable condition for transfer to Aurora Lakeland.  She potentially needed to be transported a second time from Aurora Lakeland to Mercy Janesville. (Muzaffar Aff. ¶ 9.)

25.     Dr. Muzaffar agreed to accept S.S., but asked Dr. Gibson to document the reasons for transferring S.S. to Aurora Lakeland in S.S.'s record, and advised Dr. Gibson that it would be a violation of EMTALA to fail to properly document S.S.'s transfer.  (Muzaffar Aff. ¶ 10.)

26.     Dr. Gibson refused to document S.S.'s file as Dr. Muzaffar requested, and instead told Dr. Muzaffar that Dr. Gibson had previously been disciplined for violating EMTALA, and said, "Damn EMTALA." (Muzaffar Aff. ¶ 11; Blackbourn Aff. Ex. K at 119:3-10.)

27.     When S.S. arrived at Aurora Lakeland, Dr. Muzaffar observed that the emergency room records that arrived with her were obviously incomplete.  (Blackbourn Aff. Ex. K at 69:4-22.)

28.     In conversation with S.S., Dr. Muzaffar learned that Mercy Walworth had not informed S.S. of Dr. Muzaffar's recommendation that she be treated at Mercy Janesville. (Blackbourn Aff. Ex. K at 70:17-71:4.)

29.     Later, on the morning of February 14, 2010, while Dr. Muzaffar was still on call for Dr. Poplar, another patient of Dr. Poplar was transferred from Mercy Walworth to Aurora Lakeland without Dr. Muzaffar's knowledge or consent. (Muzaffar Aff. ¶ 12; Blackbourn Aff. Ex. K at 49:3-24.) This patient suffered from carbon monoxide poisoning. (Muzaffar Aff. Ex. E.) Dr. Muzaffar had no knowledge concerning this patient's condition or how this patient had been transferred to Aurora Lakeland without his knowledge. (Muzaffar Aff. ¶ 12.) Dr. Muzaffar was concerned that this patient's transfer had been improper under EMTALA. (*Id.*)

30.     The carbon monoxide patient was borderline for needing hyperbaric treatment, which was not available at Aurora Lakeland. (Muzaffar Aff. ¶ 13.) Any error in the laboratory test underestimating the patient's carbon monoxide level would have required a second unstable transfer from Aurora Lakeland to a facility that could provide hyperbaric treatment. (*Id.*)

31.     Between February 14 and 23, 2010, Dr. Muzaffar told Dr. Greg Gerber, the president of the Aurora Lakeland Medical Executive Committee, that Mercy Walworth physicians had essentially forced S.S.'s transfer from Mercy Walworth to Aurora Lakeland on Dr. Muzaffar, that Dr. Muzaffar was reluctant to accept that transfer, and that another patient had been transferred without Dr. Muzaffar's knowledge while Dr. Muzaffar was covering for Dr. Poplar. (Blackbourn Aff. Ex. K at 54:6-21.)

32.     On February 23, 2010, Dr. Muzaffar reported his concerns in a letter to the Medical Executive Committee regarding the second patient that had been transferred to Aurora

8

Lakeland from Mercy Walworth without Dr. Muzaffar's knowledge. (Blackbourn Aff. Ex. D at Bates No. 89.)

33. Dr. Muzaffar's February 2010 letter to the Medical Executive Committee raised EMTALA issues to a knowledgeable reader:

(GARY M. STEIN)

[I] would point out, to answer you more fully, he doesn't use the word EMTALA, but anyone with a basic understanding of EMTALA would recognize that the facts he is putting forth represents a serious challenge to meeting the EMTALA requirements.

(Blackbourn Aff. Ex. F at 45:19-23.)

THE WITNESS: I believe that his letter, without using the word EMTALA, raises EMTALA concerns. How he chose to answer in the venue of a deposition, I can't account for, but it's hard to imagine any interpretation other than we're talking about an EMTALA issue here.

(Blackbourn Aff. Ex. F at 47:10-15.)

THE WITNESS: [I]'m not disagreeing with his testimony. I am simply saying, again, that when I read his letter of February 23rd, it is clear to me, as an expert, that the issues he's raising in this letter are EMTALA issues.

(Blackbourn Aff. Ex. F at 52:5-10.)


**Aurora Lakeland Medical Staff Bylaws**

34. Proceedings of the Medical Executive Committee are governed by the Aurora Lakeland Center Medical Staff Bylaws ("Bylaws"). (R. Doc. 94-3 at 1-2.)

35. The Bylaws prescribe procedures for investigating and taking "corrective action" against a physician. (R. Doc. 94-3 at art. 4.)

9

36.     Under the Bylaws, corrective action against a physician must be initiated by written request of a specified person such as the hospital administrator, a clinical chairperson, or a member of the Medical Executive Committee, if information indicates that a physician's "acts, omission, demeanor, conduct, or professional performance may be . . . disruptive . . ." (R. Doc. 94-3 § 4.1.2.)

37.     The Bylaws require that a physician subject to a request for corrective action must be provided with notice of the request and an opportunity for a preliminary interview with the Medical Executive Committee.  (R. Doc. 94-3 §§ 4.1.3, 4.1.4.)

38.     The Bylaws require the Medical Executive Committee to investigate the request for corrective action and "make a reasonable attempt to obtain the facts related to such concerns."  (R. Doc. 94-3 § 4.1.5.)

39.     Following investigation, the Medical Executive Committee may take action, including "issuing a warning . . . imposition of a term of probation or monitoring, requirement to seek consultations . . . [or] any other action which may be appropriate under the circumstances."  (R. Doc. 94-3 § 4.1.5.)


**The Medical Executive Committee's Response to Dr. Muzaffar's February 23 Letter**

40.     At its meeting on March 11, 2010, the Medical Executive Committee discussed Dr. Muzaffar's February 23, 2010, letter.  (Blackbourn Aff. Ex. D at Bates No. 1005-06.)

41.     The Medical Executive Committee did not contact Dr. Muzaffar before this meeting.  (Muzaffar Aff. ¶¶ 14-15.)

10

42.     At its March 11, 2010, meeting, instead of addressing Dr. Muzaffar's concerns about the Mercy Walworth transfers, the Medical Executive Committee summarily concluded: "This physician has a history of being difficult and unable to cooperate with other members of the medical staff. The Committee will further investigate this instance as well as past . . . ." (Blackbourn Aff. Ex. D at Bates No. 1006.)

43.     Dr. Muzaffar received a letter from Dr. Gerber, the president of the Aurora Lakeland Medical Executive Committee, dated March 15, 2010, acknowledging receipt of Dr. Muzaffar's February 23, 2010, letter and informing him that an investigation regarding the Mercy Walworth transfers would be conducted. (Blackbourn Aff. Ex. D at Bates No. 102.) Dr. Gerber did not inform Dr. Muzaffar in this letter that the Medical Executive Committee was considering corrective action against Dr. Muzaffar. (*Id.*)

44.     On March 24 and 26, 2010, the Medical Executive Committee solicited comments from the two Mercy Walworth physicians involved in the transfer of the Mercy Walworth patients. (Blackbourn Aff. Ex. D at Bates No. 105, 107.)

45.     In a letter to Medical Executive Committee member Dr. Mark Brower, dated March 29, 2010, Dr. Gibson wrote that on the night of the Mercy Walworth transfers, Dr. Muzaffar asserted to him, on the telephone, that S.S.'s transfer under the circumstances would constitute an EMTALA violation. (Blackbourn Aff. Ex. D at Bates No. 108-09.)

46.     In a letter to Dr. Gerber, dated April 4, 2010, Mercy Walworth physician Robert A. Fasano wrote that he spoke with Dr. Gibson about the transfer of S.S. and was told that Dr. Muzaffar "was threatening to report Dr. Gibson for EMTALA law violation if he did not

11

state these reasons [for the transfers] in his dictation." (Blackbourn Aff. Ex. D at Bates Nos. 110-11.)

47.     The Medical Executive Committee minutes of its April 8, 2010, meeting state that the Medical Executive Committee "conducted an investigation" regarding the Mercy Walworth transfers, but the Medical Executive Committee never contacted Dr. Muzaffar as part of that investigation. (Blackbourn Aff. Ex. D at Bates No. 1008; Muzaffar Aff. ¶ 14-15.) The Medical Executive Committee determined that "past issues will be collected" and legal consultation requested. (Blackbourn Aff. Ex. D at Bates No. 1008.) The minutes state that the Medical Executive Committee was "considering some form of corrective action. (*Id.*)

48.     At its May 13, 2010, meeting, the Medical Executive Committee directed that "[t]he Director of Risk Management will work with legal counsel to draft a letter." (Blackbourn Aff. Ex. D at Bates No. 1010-11.) Dr. Muzaffar still had no notice or opportunity to be heard on the alleged misconduct issues. (Muzaffar Aff. ¶ 14-15.)

49.     On May 21, 2010, 41 days before the July 1, 2010, Medical Executive Committee meeting where Dr. Muzaffar was supposed to have been able to give his side of the events concerning the Mercy Walworth transfers, Aurora's Director of Risk Management asked legal counsel for "assistance in drafting a letter to Dr. Kamal Muzaffar, M.D. regarding his behavior and/or inability to get along with others. In question is his citizenship at the hospital." (Blackbourn Aff. Ex. D at Bates No. 113.) The "legal counsel" to whom this request was directed was Carrie Killoran, one of Aurora's expert witnesses in this action. (*Id.*)

50.     At its June 10, 2010, meeting, the Medical Executive Committee reviewed its Bylaws "regarding corrective action procedures." (Blackbourn Aff. Ex. D at Bates No. 1013.)

The Medical Executive Committee stated that its investigation was "completed," even though Dr. Muzaffar still had no notice or opportunity to be heard. (*Id.*; Muzaffar Aff. ¶¶ 14-15.)

51.     In a letter dated June 10, 2010, from Dr. Gerber, Dr. Muzaffar was summoned to appear at a July 1, 2010, meeting of the Medical Executive Committee. (Blackbourn Aff. Ex. D at Bates No. 115.)  This letter made no mention that the Medical Executive Committee would be discussing incidents of alleged inappropriate conduct by Dr. Muzaffar, although the Medical Executive Committee had already had legal counsel prepare a disciplinary letter. (*Id.*)

52.     Dr. Muzaffar requested that medical records of the Mercy Walworth transfer patients be available at the July 1, 2010, Medical Executive Committee meeting, but the Medical Executive Committee denied that request. (Blackbourn Aff. Ex. K at 83:11-84:5.)

53.     At the July 1, 2010, Medical Executive Committee meeting, Dr. Gerber interrupted Dr. Muzaffar's explanation of his conversations with Dr. Gibson about S.S.'s transfer by angrily interjecting that it was extremely inappropriate for Dr. Muzaffar to talk to Dr. Gibson about EMTALA. (Blackbourn Aff. Ex. K at 114:17-23; Muzaffar Aff. ¶ 16.)

54.     When Dr. Muzaffar asked why it would be inappropriate for Dr. Muzaffar to talk to Dr. Gibson about EMTALA in a conversation about a patient transfer, Dr. Gerber became livid. (Blackbourn Aff. Ex. K at 114:24-115:6.)

55.     Although they were asserted as a basis for discipline by the Medical Executive Committee, the committee never provided Dr. Muzaffar with copies of Dr. Fasano and Dr. Gibson's letters. (Blackbourn Aff. Ex. K at 83:11-13.)  Dr. Gerber could not explain this. (Blackbourn Aff. Ex. M at 45:25-46:11, 47:14-19.)

13

56.     At the July 1, 2010, Medical Executive Committee meeting, the committee did not address Dr. Muzaffar's concerns about the Mercy Walworth transfers. (Blackbourn Aff. Ex. D at Bates Nos. 127.)  Instead, with no warning, the Medical Executive Committee revisited prior incidents of alleged inappropriate conduct by Dr. Muzaffar, all of which had been previously addressed and resolved by the Medical Executive Committee in 2009. (Blackbourn Aff. Ex. D at Bates Nos. 124 (summary of past events given "To Greg & MEC"), 1101 (past documented issues presented to legal counsel), 127 (discipline taken because "The investigation of this incident coupled with past incidents revealed . . . ."), Ex. E at 53:25-54.14.)

57.     At a 2009 meeting about these incidents of alleged inappropriate conduct, the Medical Executive Committee had concurred with Dr. Muzaffar that some of the issues raised at that time were very minor and did not need to be discussed.  (Blackbourn Aff. Ex. K at 45:2-20.)

58.     Regarding the other incidents discussed in 2009, the Medical Executive Committee had then merely suggested that Dr. Muzaffar and another doctor try to work better together.  (Blackbourn Aff. Ex. K at 45:21-23, 46:4-17.)

59.     At the July 1, 2010, Medical Executive Committee meeting, the committee "strongly recommended" that Dr. Muzaffar obtain counseling and work with a mentor for a three month period.  (Blackbourn Aff. Ex. D at Bates No. 127.)

60.     At the July 1, 2010, Medical Executive Committee meeting, one physician member of the Medical Executive Committee threatened to revoke Dr. Muzaffar's admitting privileges at Aurora Lakeland.  (Blackbourn Aff. Ex. K at 96:24-97:15.)

14

61.     A physician member of the Medical Executive Committee who participated in the July 1, 2010, meeting commented that Dr. Muzaffar was "getting too legalistic" about EMTALA.  (Blackbourn Aff. Ex. K at 118:2-8.)

62.     A physician member of the Medical Executive Committee who participated in the July 1, 2010, meeting observed that Dr. Muzaffar was surprised by the discussion of his prior conduct issues.  ((Blackbourn Aff. Ex. E at 54:15-22.)

63.     In a letter dated July 7, 2010, the Medical Executive Committee dismissed Dr. Muzaffar's concerns about the Mercy Walworth transfers as a "non-issue," without explanation.  (Blackbourn Aff. Ex. D at Bates No. 129.)

64.     On July 8, 2010, the Medical Executive Committee issued a letter memorializing the "recommendations" it had imposed on Dr. Muzaffar at the July 1, 2010, meeting.  (Blackbourn Aff. Ex. D at Bates No. 131.)  This letter was sent to Dr. Muzaffar by certified mail.  (*Id.* at Bates No. 130.)  It was placed in Dr. Muzaffar's Quality Assurance file.  (*Id.* at 131 (handwritten note "for QA file").)

65.     Each letter written by a member of the Medical Executive Committee relating to its "investigation" into Dr. Muzaffar's February 23, 2010, letter was stored electronically in a directory called "corrective actions/Muzaffar."  (Blackbourn Aff. Ex. D at Bates Nos. 102, 105, 115, 129, 131 (pathnames at bottom of pages).)

66.     The actions taken by the Medical Executive Committee on July 1 and 8, 2010, constituted "corrective action" against Dr. Muzaffar, taken in violation of the procedural provisions of the Bylaws.  ((Blackbourn Aff. Ex. F at 107:22-108:18, 108:24-109:16.)

15

67.     A physician member of the Medical Executive Committee who participated in the July 1, 2010, meeting told Dr. Muzaffar that "none of this would have happened" if Dr. Muzaffar had not written the February 23, 2010, letter expressing his concerns about the Mercy Walworth transfers.  (Blackbourn Aff. K at 87:5-14); Ex. G at 24:1-8.)  This physician agreed that Dr. Muzaffar's February 23, 2010, letter was the "catalyst" that caused Dr. Muzaffar to be disciplined by the Medical Executive Committee.  (Blackbourn Aff. Ex. G at 25:5-10.)

## The State of Wisconsin Investigates Mercy Walworth

68.     After the July 1, 2010, Medical Executive Committee meeting, Dr. Muzaffar reported his concerns over the Mercy Walworth transfers to the State of Wisconsin, Department of Health Services, Division of Quality Assurance ("DHS").  (Blackbourn Aff. Ex. K at 71:16-72:4, 73:1-10.)

69.     DHS conducted an audit of patient records at Mercy Walworth that yielded a written report.  (R. Doc. 83-4.)

70.     In the report, the DHS investigator wrote about Mercy Walworth:

This facility failed to document the risks and benefits for transfers to a higher level of care facility when transfers occurred, in 6 out of 6 medical records reviewed . . . .  Failure to document individualized risks and benefits to patients related to transfers fails to identify the unique needs of each patient requiring an advanced level of care.

Findings include:

* * * *

16

Facility policy titled, "EMTALA Screening, Treatment & Transfer of Patients," . . . states . . . "Physician Certification . . .The certification must contain a summary of the specific needs on which it is based.

* * * *

The facility's transfer form . . . is a computer generated form which reiterates Federal EMTALA . . . regulations and language.  The second titled, "Patient's Condition," is a computer generated statement and does not include any medical information about the patient at all.  It is the same for all 6 patients.

* * * *

A review of Pt. #10's ER record from 2/13/10 was reviewed . . . .  Pt. #10 signed a transfer form to be transferred to a higher level of care facility.  There is no documentation within the medical record stating what the benefits or risks for the transfer are.

(R. Doc. 83-4.)

71.     "Pt. #10" was treated at Mercy Walworth on February 23, 2010, the date S.S. was transferred from Mercy Walworth to Aurora Lakeland.  (*Id.*)

72.     The symptoms described for Pt. #10 in the DHS report match S.S.'s symptoms on February 13, 2010, as described by Dr. Gibson.  (*Compare* Blackbourn Aff. Ex. D at Bates No. 108 *with* R. Doc. 83-4.)

73.     DHS followed up on its report by asking the Center for Medicaid and Medicare Services ("CMS"), the federal agency responsible for enforcing EMTALA, if CMS wanted DHS to conduct an EMTALA investigation on behalf of CMS.  (Frazier Aff., ¶ 1, Ex. A, B.)

74.     CMS declined a federal investigation because it judged DHS' action was sufficient to deal with the cause of the Mercy Walworth violations.  (Frazier Aff., Ex. B.)

**Aurora Lakeland Fails to Follow Up on Discipline**

75.     In spite of the Medical Executive Committee's "recommendation," Dr. Cary Berkowitz, the appointed mentor for Dr. Muzaffar told Dr. Muzaffar he did not expect to meet with Dr. Muzaffar weekly.  (Blackbourn Aff. Ex. K at 122:11-12.)  Dr. Muzaffar spoke with Dr. Berkowitz if Dr. Muzaffar had any problems.  (Blackbourn Aff. Ex. K a 121:15-22.)

76.     Dr. Muzaffar did not obtain counseling or meet weekly with Dr. Berkowitz.  (Blackbourn Aff. Ex. K at 94:14-18, Ex. G at 28:14-22.)  The Medical Executive Committee did not take any action.  (Muzaffar Aff. ¶ 17.)

77.     At the Medical Executive Committee meeting on April 14, 2011, Dr. Berkowitz gave a report about Dr. Muzaffar to the committee that: "There have been no further issues and areas of concern seem to be improving."  (Blackbourn Aff. Ex. D at Bates Nos. 1022-23.)

**Aurora Claims It Terminated Dr. Muzaffar's Network Membership in 2010**

78.     Aurora claims that Dr. Muzaffar's membership in the Aurora Network was terminated in 2010.   (Blackbourn Aff. Ex. B at 9:22-24.)

79.     Dr. Muzaffar received no advance notice or explanation for his claimed termination from the Aurora Network.   (Muzaffar Aff. ¶ 3.)

80.     Shari Voightschild ("Voightschild") is Director of Accounts Services, responsible for contracting with independent physicians for the Aurora Network.  (Blackbourn Aff. Ex. A at 4:4-20.)

Case 2:13-cv-00744-NJ   Filed 06/26/15   Page 18 of 25   Document 118

81.     Voightschild could not explain why Dr. Muzaffar was allegedly terminated from the Aurora Network.  (Blackbourn Aff. Ex. A at 18:11-19:2.)

82.     Jessie James ("James") is the supervisor of Aurora's Credentialing Department.  (Blackbourn Aff. Ex. B at 3:23-4:8.)

83.     James testified:

(ATTORNEY LISLE W. BLACKBOURN)

Q       Was there any documentation generated as a result of Dr. Muzaffar's membership in the Aurora Direct Network having terminated in 2010?

(JESSIE JAMES)

A       We would have gotten a directive to term the provider, so --

Q       And where would that directive have come from?

A       I couldn't tell you.  It could have come from a number of places.  That being so long ago, I have no idea.

* * * *

Q       But you don't know who would have issued that directive, as you sit here today?

A       No.  We're talking five years ago.

Q       Would there be a record of it that would still exist as to the termination itself?

A       I don't know.  If there is one, it would be in his file.

(Blackbourn Aff. Ex. B at 10:2-11, 10:21-11:2.)  Dr. Muzaffar requested this witness to produce Dr. Muzaffar's "file," and the file contains no directive terminating Dr. Muzaffar's Aurora Network membership.  (Blackbourn Aff. Ex. B at 11:12-14.)

84.     No one from Aurora knows why Dr. Muzaffar's membership was terminated.  Aurora could not produce any written documents or other information in discovery

19

to show why Dr. Muzaffar's membership in the Aurora Network was terminated, or that Dr. Muzaffar was ever given notice of such termination.  (Blackbourn Aff. Ex. B at 8:18-12:11.)

### Aurora's 2013 Denial of Aurora EPIC Based On Dr. Muzaffar's Nonmembership in the Network

85.     In April 2013, Dr. Muzaffar sought to purchase access to Aurora's electronic medical records system, "Smart Chart Connect," also known as "Aurora EPIC," a software product allowing electronic access to patient medical records.  (Blackbourn Aff. Ex. L, Ex. H at 7:9-22.)

86.     According to Aurora, Dr. Muzaffar was not eligible to purchase EPIC because he was not a member of the Aurora Network.  (Blackbourn Aff. Ex. H at 33:1-19.)  Dr. Muzaffar's contract with the Aurora Network had never been terminated.  (*See* ¶¶ 79-85, above.)

87.     Dr. Muzaffar nevertheless provided Aurora a "pre-application" for participation in the Aurora Network on June 4, 2013.  (Blackbourn Aff. Ex. I at 3-4.)

88.     The form that Dr. Muzaffar filled out to become a member of "Aurora Direct Network" is used for independent providers, meaning nonemployed Aurora health care providers who are looking to participate in the network.  (Blackbourn Aff. Ex. I at 3-4, Ex. B at 6:23-7:8.)

89.     Despite the various name changes, the routine practice by which applications for membership in the Aurora Network by independent health care providers, such as Dr. Muzaffar, has not changed in any meaningful way.  (Blackbourn Aff. B. at 12:21-13:3, 13:10-14.)

90.     After receiving Dr. Muzaffar's 2013 application, Jessie James ("James"), supervisor for the Aurora Credentialing Committee, forwarded the application to the regional leaders in the Aurora region where Dr. Muzaffar practiced. Regional leaders were to review the application and make a determination as to whether there was a need to admit Dr. Muzaffar to the Aurora Direct Network. (Blackbourn Aff. Ex. B at 7:13-22.)

91.     Aurora could not produce any documents or information during discovery which would identify the regional leaders who participated in the decision to reject Dr. Muzaffar's 2013 application for membership in the Aurora Direct Network. (Blackbourn Aff. Ex. B at 7:23-25.)

92.     Dr. Muzaffar's 2013 application for membership in the Aurora Direct Network, produced by Aurora in discovery, contains a handwritten note in the margin by an unnamed author confirming that Dr. Muzaffar was previously in the Aurora Direct Network. (Blackbourn Aff. Ex. B at 8:7-21.)

93.     The decision to reject Dr. Muzaffar's 2013 application for membership in the Aurora Direct Network would normally have been communicated to by email, but no such email was ever produced by Aurora in discovery. (Blackbourn Aff. Ex. B at 12:12-20.)

94.     In a letter dated July 9, 2013, James informed Dr. Muzaffar that the Board of Aurora Accountable Care Network had established a moratorium on adding new physician providers. James does not know the identity of any members of this board. James does not know when the moratorium was enacted. James does not know why the moratorium was enacted. James cannot identify any other health care provider located in Aurora's South Region,

21

where Dr. Muzaffar is located, to which the moratorium has been applied.  (Blackbourn Aff. Ex. B at 14:4-16:18, Ex. J.)

95.     In her July 9, 2013 letter to Dr. Muzaffar, James writes that Dr. Muzaffar cannot reapply to the Aurora Network for a period of five years.  This rule was apparently enacted by one of Aurora's outside attorneys.  (Blackbourn Aff. Ex. B at 20:3-21:2.)

96.     James is unaware of any reason or policy behind the rule which prohibits Dr. Muzaffar from reapplying for membership in the Aurora Network for five years. (Blackbourn Aff. Ex. B at 21:11-13.)

97.     Andrew Sennett ("Sennett") is currently employed by Aurora as a Market Sales Executive.  From July 1998 to March 4, 2013, Sennett was employed by Aurora as a Market Manager.  From March 2013 to February 2014, Sennett was employed by Aurora Accountable Care Network as a Key Accounts Representative.  (Blackbourn Aff. Ex. N at 3:6-11; 16-23.)

98.     As of 2013, Sennett had known Dr. Muzaffar for about 12 years. (Blackbourn Aff. Ex. N at 5:4-12.)

99.     In April 2013, Sennett commented on Dr. Muzaffar's 2013 application for membership in the Aurora Direct Network.  In an email dated April 15, 2013, Mr. Sennett wrote:

> He is an independent FP (family practitioner) in Elkhorn.  I spoke with the credentialing folks in AACN this morning [sic] he is not credentialed in AACN. He has not been active since 1/5/2010.  He was active from 7/5/2002 to 1/5/2010 in the AHN and then ADN.  Strategically thinking, he doesn't have a big practice **and over the years has not endeared himself to many at ALMC,** however Mercy, I am sure would love to have his admissions.  **Anything we can do to tie independents more closely to us would be helpful.**

(Blackbourn Aff. Ex. L at Bates No. 7001, Ex. N at 6:19-7:23.)

22

100. [Omitted.]

101. Sennett testified that having independent physicians become members of the Aurora Direct Network is in Aurora's **"best business interest."** Under normal circumstances Aurora is interested in receiving as many referrals from independent physicians as possible. (Blackbourn Aff. Ex. N at 11:22-12:8 (emphasis added).)

102. Sennett told Dr. Muzaffar that Dr. Muzaffar did not qualify to receive the Aurora EPIC electronic medical records system because he was not a member of the Aurora Affordable Care Network. (Blackbourn Aff. Ex. N at 18:18-25.) Sennett does not know why Dr. Muzaffar's membership in the Network was terminated. (*Id.* at 23:25-24:23.)

103. Dr. Poplar practices medicine independently in Delavan, Wisconsin, about 6-1/2 miles from Dr. Muzaffar's office. (Muzaffar Aff.¶ 18.) Dr. Poplar's practice is similar in specialty, size, and geographic scope to Dr. Muzaffar's practice. (*Id.*)

104. Dr. Poplar was not terminated from the Aurora Network and was offered access to Aurora EPIC. (Muzaffar Aff. ¶ 19.)

## The Effects of Aurora's Retaliation

105. After the July 1, 2010, Medical Executive Committee meeting, the members of the Medical Executive Committee who were present at the meeting changed their attitude toward Dr. Muzaffar and became generally dismissive of him. (Blackbourn Aff. Ex. K at 95:25-96:9, 131:20-22 ("I shared with you that the attitude of my colleagues toward me has changed. It's gotten difficult for me to do business here."), 132:1-3.)

23

106.    The Medical Executive Committee did not keep its July 1, 2010, meeting with Dr. Muzaffar confidential: about a month after the meeting, a colleague of Dr. Muzaffar asked, "What happened between you and Aurora?"  (Blackbourn Aff. Ex. K at 87:3-13.)

107.    Elkhorn Family Clinic, S.C. is a chapter S corporation of which Dr. Muzaffar is the sole shareholder.  (Blackbourn Aff. Ex. K at 13:11-19; R. Doc. 70 ¶ 2.)  Income to the corporation flows directly through to Dr. Muzaffar in the form of salary and dividends. (Blackbourn Aff. Ex. K at 127:16-128:3.)

108.    Dr. Muzaffar's practice has experienced increased personnel expenses from 2011 through 2014.  (Muzaffar Aff. ¶¶ 20-21, Ex. B.)  Annual personnel expenses for Dr. Muzaffar's practiced increased by more than $21,000 in that time frame.  (Muzaffar Aff. ¶ 22, Ex. B.)

109.    The increased personnel costs will continue for as long as Elkhorn Family Clinic, S.C. does not have access to Aurora's electronic medical records system.  (Muzaffar Aff. ¶ 22.)

110.    Dr. Muzaffar's practice has also experienced a decline in the number of patients treated at Aurora Lakeland from 2010 onward, reflecting a corresponding overall decrease in patient load and profitability of the practice.  (Muzaffar Aff. ¶¶ 23-25, Ex. C.)

111.    From 2011 to 2014, Dr. Muzaffar's practice has sustained cumulative lost income of more than $29,000.00.  (Muzaffar Aff. ¶ 24.)  This loss is attributable to lost Aurora Lakeland patients because Dr. Muzaffar cannot effectively service them without access to the Aurora EPIC electronic medical records system and because treatment he receives at Aurora

Lakeland has forced him to travel to other health care facilities to work as an independent emergency room physician.  (Muzaffar Aff. ¶ 24.)

112.    Because Dr. Muzaffar has been forced to move his practice to other facilities, he has incurred increased travel expenses and time away from family.  (Blackbourn Aff. Ex. K at 96:16-23; Muzaffar Aff. ¶ 24.)

113.    The reduced profitability of Elkhorn Family Clinic, S.C. has made it more difficult for Dr. Muzaffar to maintain the carrying costs of the building he owns in which Elkhorn Family Clinic, S.C. operates.  (Blackbourn Aff. Ex. K at 96:16-23.)

Dated this 26th day of June, 2015.

GODFREY, LEIBSLE, BLACKBOURN &
  HOWARTH, S.C.
Attorneys for Plaintiff


By:  s/Lisle W. Blackbourn
    Lisle W. Blackbourn (1003897)


Lisle W. Blackbourn
GODFREY, LEIBSLE, BLACKBOURN &
  HOWARTH, S.C.
354 Seymour Court
Elkhorn, Wisconsin  53121
Telephone: (262) 723-3220
Facsimile: (262) 723-5091
email: lblackbourn@godfreylaw.com
T:\E\Elkhorn\FamilySC\Aurora Litigation\off copy\consolidated statement of facts oppose summ j mots-6.docx