UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KAMAL MUZAFFAR, M.D.,

    Plaintiff,

    v.                                                     Case No. 13-CV-744

AURORA HEALTH CARE SOUTHERN
LAKES, INC.,

    Defendant.

## DECISION AND ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

    Dr. Kamal Muzaffar brings this action under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, against Aurora Health Care Southern Lakes, Inc., alleging that he was retaliated against after reporting what he believed to be violations of EMTALA. Aurora has moved for summary judgment on several grounds. First, Aurora argues that Dr. Muzaffar's lawsuit was not brought within the statute of limitations. (Docket # 70.) Second, it argues that Dr. Muzaffar's claim that Aurora retaliated against him when it denied him access to Aurora Epic cannot be proven. (Docket # 73.) Aurora also argues that it should be granted summary judgment because Dr. Muzaffar has failed to prove damages (Docket # 81) and because Dr. Muzaffar has failed to establish any causal connection between his reporting of EMTALA violations and actions taken by Aurora (Docket # 84). Each of those motions have been fully briefed. For the reasons I explain below, Aurora's motion for summary judgment relating to the statute of

limitations is granted and the case will be dismissed. The defendant's remaining motions are moot.

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check*

2

*Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc.,Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## FACTS

Dr. Muzaffar commenced this action on June 28, 2013. (Pl.'s Response to Defendant's Proposed Findings of Fact Regarding the Statute of Limitations ("DPFOF 1"), Docket # 120 at ¶ 1.) Dr. Muzaffar's second amended complaint alleges that he reported EMTALA violations relating to transfers that occurred on February 13 or 14, 2010. (DPFOF 1 at ¶ 4.) He also alleges that Aurora retaliated against him in violation of the whistleblower provisions of 42 U.S.C. § 1395dd(i) on July 1, 2010 and July 8, 2010 based on actions of the Medical Executive Committee for reporting that the transfer violated EMTALA. (DPFOF 1 at ¶ 5.) Dr. Muzaffar alleges that he was retaliated against in 2013 when Aurora denied him access to Aurora EPIC.[1] (DPFOF 1 at ¶ 4.)

1. *The Mercy Walworth Transfers*

On the night of February 13-14, 2010, Dr. Muzaffar was on call at Aurora Lakeland, covering for a colleague, Dr. Clifford Poplar. (PPFOF at ¶ 18.) He received a call from Dr. Mark S. Gibson, an emergency room physician at Mercy Walworth Hospital & Medical Center. (PPFOF at ¶ 19.) Dr. Gibson requested to transfer one of his patients, S.S., to Aurora Lakeland. (*Id.*) Dr. Muzaffar told Dr. Gibson that he was familiar with S.S., who was a pancreas transplant patient, and he asked Dr. Gibson to check to see if S.S. could be treated at Mercy Walworth. (PPFOF at ¶ 20.) Dr. Gibson called a second time that night and advised Dr. Muzaffar that S.S. needed care in an ICU, which Mercy Walworth did not

---

[1] Dr. Muzaffar's second amended complaint also contains allegations that Aurora failed to respond when he reported certain other transfers violated EMTALA (Second Am. Compl., Docket # 37 at ¶ 28), but he states that he does not base his whistleblower claim on these allegations (DPFOF 1 at ¶¶ 6-7).

3

have. (PPFOF at ¶ 21.) According to Dr. Muzaffar, he told Dr. Gibson that he would accept S.S. but that he asked Dr. Gibson to document the reasons for the transfer so as to not violate EMTALA. (PPFOF at ¶ 25.) Dr. Muzaffar further alleges that Dr. Gibson refused to document the file and that Dr. Gibson told him that he had previously been disciplined for violating EMTALA. (PPFOF at ¶ 26.) When S.S. arrived at Aurora Lakeland, Dr. Muzaffar believed that emergency room records were incomplete. (PPFOF at ¶ 27.) According to Dr. Muzaffar, S.S. told him that Mercy Walworth had not informed S.S. that he recommended that she be treated at Mercy Janesville. (PPFOF at ¶ 28.)

While Dr. Muzaffar was still covering for Dr. Poplar, another patient, S.L., was transferred to Aurora Lakeland from Mercy Walworth. (PPFOF at ¶ 29.) Dr. Muzaffar avers that he had no knowledge of S.L.'s condition or how the patient had been transferred to Aurora Lakeland without his knowledge. (*Id.*) He was concerned that transfer violated EMTALA. (*Id.*)

According to Dr. Muzaffar, he spoke with Dr. Greg Gerber sometime between February 14 and February 23, 2010 and told Dr. Gerber that he believed the S.S. transfer violated EMTALA. (PPFOF at ¶ 31.) Dr. Muzaffar wrote a letter to the Medical Executive Committee dated February 23, 2010. (PPFOF at ¶ 32.) He states that in this letter he raised concerns to the committee about what he believed were or could have been EMTALA violations. (PPFOF at ¶¶ 32, 33.)

  2. *Dr. Muzaffar's Disciplinary History and the Medical Executive Committee*

In February 2009, a registered nurse at Aurora Lakeland reported an interaction with Dr. Muzaffar in which she asked Dr. Muzaffar to speak to the husband of a patient who was in the intensive care unit. (Pl.'s Response to Defendant's Proposed Findings of Fact

4

Regarding Aurora EPIC ("DPFOF 2"), Docket # 121 at ¶ 1.) The nurse reported that when she advised Dr. Muzaffar that the husband wanted to speak with him, Dr. Muzaffar responded: "I do not have to drop my pants for every person that comes in there, tell him to go to hell." (DPFOF 2 at ¶ 1.) The minutes from an April 9, 2009 meeting of the Medical Executive Committee show that the Committee was concerned about Dr. Muzaffar's alleged inappropriate behavior with patients and staff. (DPFOF 2 at ¶ 2.) By a letter dated April 17, 2009, Dr. Muzaffar was invited to a meeting with a subcommittee to discuss issues that had been raised about his interpersonal interactions with colleagues and patients. (DPFOF at ¶ 2.) Minutes from a May 14, 2009 meeting of the Medical Executive Committee reflect that Dr. Muzaffar had been discussed at a subcommittee meeting and that Dr. Muzaffar would be requested to attend a Medical Executive Committee meeting if further incidents of inappropriate behavior were reported. (DPFOF 2 at ¶ 3.)

When the Medical Executive Committee met on March 11, 2010, the Committee discussed Dr. Muzaffar's February 23, 2010 letter. (PPFOF at ¶ 40.) The minutes from the meeting indicate that the Committee discussed Dr. Muzaffar's past history of "being difficult and unable to cooperate with other members of the medical staff," noting the Committee would investigate "this instance" as well as past instances. (PPFOF at ¶ 42.) Dr. Muzaffar received a letter from Dr. Gerber dated March 15, 2010, which acknowledged receipt of his February 23, 2010 letter and informed him that an investigation regarding the Mercy Walworth transfers would be conducted. (PPFOF at ¶ 43.) The letter did not state the Committee was considering corrective action against Dr. Muzaffar. (*Id.*) Dr. Mark Brower wrote a letter to the Medical Executive Committee, dated March 29, 2010, and wrote that on the night of the Mercy Walworth transfers, Dr. Muzaffar asserted to him that

5

S.S.'s transfer would constitute an EMTALA violation under the circumstances. (PPFOF at ¶ 45.) In a letter to Dr. Gerber dated April 4, 2010, Dr. Robert A. Fasano wrote that he spoke with Dr. Gibson about the S.S. transfer and was told that Dr. Muzaffar "was threatening to report Dr. Gibson for EMTALA law violation if he did not state these [sic] reasons [for the transfers] in his dictation." (PPFOF at ¶ 46.)

The minutes of a April 8, 2010 meeting of the Medical Executive Committee reflect that the Committee had "conducted an investigation" regarding the Mercy Walwroth transfers, though the Committee never contacted Dr. Muzaffar. (PPFOF at ¶ 47.) The Committee determined that "past issues will be collected" and legal consultation requested. (*Id.*) The minutes also reflect that the Committee was considering "some form of corrective action." (*Id.*) Minutes from a May 13, 2010 meeting of the Medical Executive Committee reflect that the Committee directed that "[t]he Director of Risk Management . . . work with legal counsel to draft a letter." (PPFOF at ¶ 48.) The Director of Risk Management did ask legal counsel for assistance in drafting a letter to Dr. Muzaffar about his behavior and ability to get along with other hospital staff. (PPFOF at ¶ 49.) The Medical Executive Committee met again on June 10, 2010, and the minutes of that meeting reflect that the Committee reviewed its Bylaws concerning corrective action procedure and that the Committee stated its investigation was completed. (PPFOF at ¶ 50.) Dr. Muzaffar was asked to attend the July 1, 2010 meeting in a letter from Dr. Gerber. (PPFOF at ¶ 51.) Dr. Muzaffar asked that the medical records of the Mercy Walworth transfer patients be available at that meeting, but his request was denied. (PPFOF at ¶ 52.)

The Medical Executive Committee met on July 1, 2010, and the minutes indicate that the purpose of the special meeting was to find a creative way to help Dr. Muzaffar

6

resolve his interpersonal issues, citing to a February 2010 incident concerning an emergency department patient and noting that Dr. Muzaffar had "exhibited a repeated pattern of interaction difficulties with his colleagues." (DPFOF 2 at ¶ 4.) On July 8, 2010, the Medical Executive Committee sent Dr. Muzaffar a letter outlining recommendations of the Committee. (DPFOF 2 at ¶ 5; *see also* Pl.'s Response to Defendant's Proposed Findings of Fact Regarding Damages ("DPFOF 3") at ¶ 3 and PPFOF at ¶ 64.) The Committee's recommendations included counseling and working with a mentor for a three month period. (PPFOF at ¶ 59.) Dr. Muzaffar did not obtain counseling or meet weekly with his mentor, Dr. Cary Berkowitz. (PPFOF at ¶ 76.) Dr. Muzaffar's privileges at Aurora Lakeland have never been restricted by the Medical Executive Committee. (DPFOF 3 at ¶ 2.) Indeed, no further action was taken by the Medical Executive Committee regarding Dr. Muzaffar following the July 8, 2010 letter (DPFOF 3 at ¶ 5), and at an April 14, 2011 meeting of the Committee, Dr. Berkowitz reported that there had been no further issues and the areas of concern seemed to be improving (PPFOF at ¶ 77).

Following the July 1, 2010 meeting, Dr. Muzaffar reported his concerns about the Mercy Walworth transfers to the State of Wisconsin, Department of Health Services, Division of Quality Assurance ("DHS"). (PPFOF at ¶ 68.) The DHS then conducted an audit of patient records at Mercy Walworth, which yielded a written report. (PPFOF at ¶ 69.) The report noted that the facility "failed to document the risks and benefits for transfers to a higher level of care facility when the transfers occurred, in 6 out of 6 medical records reviewed . . . . ." (PPFOF at ¶ 70.) It also noted that Patient #10's (presumably S.S.'s) ER record showed a signed transfer form though there was no documentation within the medical record stating the benefits or risks of the transfer. (*Id.*) DHS then contacted the

7

Center for Medicare and Medicaid Services ("CMS") and inquired whether an EMTALA investigation should occur. (PPFOF at ¶ 73.) CMS determined that a state survey was necessary. (*Id.*)

   3. *Dr. Muzaffar's Network Membership and Aurora Epic*

In 2002, Dr. Muzaffar applied to become a member of the Aurora Health Network, Inc. He began participating in the Aurora Health Network in July 2002, at which time a contract was executed. (Ex. A to Aff. of Todd M. Weir, Docket # 131-1 at 4-9, 66.) Under the terms of the contract, Dr. Muzaffar's contract with the Aurora Health Network was to renew automatically every two years. (Defendant's Response to Plaintiff's Proposed Findings of Fact ("PPFOF"), Docket # 128 at ¶¶ 5, 6.) Letters dated July 26, 2002, September 26, 2003, July 29, 2005, and August 24, 2007 advised Dr. Muzaffar that his application for continued participation in the Aurora Health Network was approved on those respective dates. (Ex. A to Aff. of Jessie James, Docket # 130-1.) Records also show that Dr. Muzaffar was credentialed and approved for the Aurora Health Network on September 25, 2003 (Docket # 131-1 at 52, 53), July 29, 2005 (*id.* at 40, 41), and August 23, 2007 (*id.* at 28, 29). Dr. Muzaffar did not reapply for continued participation in the Aurora Health Network following August 2007. (Aff. of Jessie James, Docket # 130 at ¶ 6; Ex. A to Aff. of Todd Weir, Docket # 131-1 at 27-86.) At her deposition, Jessie James, the supervisor of Aurora's Credentialing Department (PPFOF at ¶ 82), testified that it was possible for a physician to allow their membership in the Aurora Health Network to lapse (PPFOF at ¶ 83). Dr. Muzaffar became inactive in the Aurora Health Network on January 5, 2010. (Ex. B to Aff. of Jessie James, Docket # 130-2.)

In 2012, a letter was sent to independent physicians to offer Smart Chart Connect (referred to as Aurora Epic in Dr. Muzaffar's complaint) to independent physicians who were on staff at Aurora Hospitals and members of the Aurora Accountable Care Network. (DPFOF 2 at ¶ 6.) In April 2013, Dr. Muzaffar sought to purchase access to Aurora Epic. (PPFOF at ¶ 85.) Dr. Muzaffar spoke to Alenia Brooks about whether or not he could obtain Aurora Epic. (DPFOF 2 at ¶ 8.) Dr. Muzaffar was advised that he needed to be a part of the Aurora Accountable Care Network to obtain Epic. (DPFOF 2 at ¶ 8.) Thereafter, an investigation was undertaken to determine if Dr. Muzaffar was a member of the Aurora Accountable Care Network, and the investigation established that he was not a member and therefore not eligible to be offered Aurora Epic. (DPFOF 2 at ¶ 9.) On June 4, 2013, Dr. Muzaffar submitted a "pre-application" for participation in the Aurora Accountable Care Network.[2] (PPFOF at ¶ 87.)

On June 12, 2013, Dr. Muzaffar sent a letter to Andrew Sennett, a key accounts representative with the Aurora Accountable Care Network. (DPFOF 2 at ¶ 10.) Dr. Muzaffar requested a written response that explained why he was not being offered Aurora Epic when a physician whom he believed to be similarly situated (Dr. Poplar) was being offered Aurora Epic. (DPFOF 2 at ¶ 10.) According to the defendant, Dr. Poplar was not similarly situated because he was a member of the Aurora Accountable Care Network, and Dr. Muzaffar was not. (DPFOF 2 at ¶ 12.) He was advised that he needed to be a member of the Aurora Accountable Care Network to obtain Aurora Epic. (DPFOF 2 at ¶ 14.) Dr. Muzaffar, according to the defendant, had never been a member of the Aurora Accountable

---

[2] I note that the document Dr. Muzaffar filled out was titled with "Aurora Direct Network." (*See* Ex. I to Affidavit of Lisle W. Blackbourn, Docket # 117-9 at 3-4.) The title of the form had not been changed following the formation of the Aurora Accountable Care Network. (PPFOF at ¶ 88; Aff. Of Jessie James, Docket # 130 at ¶ 11.)

Care Network. (DPFOF 2 at ¶ 15.) At his deposition, Dr. Muzaffar testified that he understood that Dr. Poplar was probably a member of the Aurora Accountable Care Network. (DPFOF 2 at ¶ 16.) He also testified that he knew of no physician that received Aurora Epic without being an Aurora Accountable Care Network physician. (DPFOF 2 at ¶ 16.)

The individual who was personally involved in offering Aurora Epic to physicians who were members of the Aurora Accountable Care Network at the time Dr. Muzaffar was advised he was not eligible for Aurora Epic had no knowledge of the allegations regarding Dr. Muzaffar's dealings with the Medical Executive Committee in 2010 and 2011. (DPFOF 2 at ¶ 17.) That person also had no knowledge of Dr. Muzaffar's allegations that he was being penalized for reporting alleged EMTALA violations. (DPFOF 2 at ¶ 17.) No one ever told Dr. Muzaffar that he did not get Aurora Epic because of what occurred at the Medical Executive Committee meeting on July 1, 2010. (DPFOF 2 at ¶ 18.)

## ANALYSIS

EMTALA prohibits hospitals from inappropriately transferring or refusing to provide medical care to people with emergency medical conditions. 42 U.S.C. §§ 1395dd(a)-(c) (requiring hospitals to provide medical screening and stabilizing treatments for all patients with emergency medical conditions). The purpose of the statute is to prevent "patient dumping," the practice of refusing to provide emergency medical treatment to patients who are unable to pay, or transferring them before their emergency conditions are stabilized. *See Beller v. Health and Hosp. Corp. of Marion County, Indiana*, 703 F.3d 388, 390 (7th Cir. 2012) (internal citations omitted). EMTALA provides a private right of action for individuals who sustain personal harm as result of a hospital's violation of the statute. *See* 42 U.S.C. §

10

1395dd(d)(2)(A). It also contains a whistleblower provision in 42 U.S.C. § 1395dd(i), which reads:

> (i) Whistleblower protections. A participating hospital may not penalize or take adverse actions against a qualified medical person described in subsection (c)(1)(A)(iii) or a physician because the person or physician refuses to authorize the transfer of an individual with an emergency medical condition that has not been stabilized or against any hospital employee because the employee reports a violation of a requirement of this section.

Dr. Muzaffar brought this action under the whistleblower provision of EMTALA, alleging, as noted above, that he was retaliated against for reporting what he believed to be violations of EMTALA.

As outlined above, Aurora moves for summary judgment on various grounds. Its first motion concerns the statute of limitations. Because I find that summary judgment should be granted on this basis, I need not address Aurora's remaining motions.

1. *Statute of Limitations*

In order to decide whether Dr. Muzaffar filed this lawsuit within the statute of limitations, I must first determine what the applicable statute of limitations actually is. The parties disagree on this issue, and neither party has cited, nor have I found, any case directly discussing this issue. As noted above, EMTALA provides a private right of action for patients that believe they were harmed by an EMTALA violation. 42 U.S.C. § 1395dd(d)(2). Section 1395(d)(2)(C) provides a two-year statute of limitations for civil enforcement actions. It reads:

> (C) Limitations on actions. No action may be brought under this paragraph more than two years after the date of the violation with respect to which the action is brought.

The whistleblower provision, 42 U.S.C. § 1395dd(i), does not contain an explicit statute of limitations, however. While the defendant argues that the two-year statute of limitations provided for in the private cause of action provision applies, the plaintiff argues that because the whistleblower provision does not contain a statute of limitations, a comparable state law statute of limitations should apply.

In arguing that the two-year statute of limitations in § 1395dd(d)(2)(C) does not apply, Dr. Muzaffar notes that the subsection refers to actions "brought under this paragraph." He argues that this evidences that the two-year statute of limitations does not apply to whistleblower actions and, therefore, does not apply to his claim. Dr. Muzaffar argues that the applicable statute of limitations must be taken from an analogous state statute of limitations. He cites to *Gray v. Lacke*, 885 F.2d 399, 408 (7th Cir. 1989), and *Ruh v. Samerjan*, 816 F. Supp. 1326, 1330 (E.D. Wis. 1993), to support his argument that Wisconsin's six year statute of limitation for injury to character or other rights, Wis. Stat. § 893.53, should apply to his EMTALA claim just as it applies to suits for federal civil rights violations, including retaliation, brought under 42 U.S.C. § 1983. Dr. Muzaffar's argument, however, is unconvincing. First, the argument ignores the fact that § 1983 contains no statute of limitations at all (unlike § 1395dd, which does contain one). Second, Dr. Muzaffar fails to demonstrate why Wisconsin's injury to character or other rights is analogous to his claim brought under EMTALA. As the Seventh Circuit explained in *Gray*, courts apply Wisconsin's six-year general or residual statute of limitations to § 1983 claims under Supreme Court precedent relating expressly to § 1983 claims. *See* 885 F.2d at 407-09 (citing *Wilson v. Garcia*, 471 U.S. 261 (1985) and *Owens v. Okure*, 488 U.S. 235 (1989)). The plaintiff
12

has failed to explain why this § 1983-specific rationale and holding should apply to his EMTALA whistleblower claim.

Additionally, I note that Dr. Muzaffar does not address the cases that suggest the two-year statute of limitations found in § 1395dd(d)(2)(C) does apply to EMTALA whistleblower claims. In *Ritten v. Lapeer Regional Medical Center*, No. 07-10265, 2010 WL 374163, *8, *8 n.7 (E.D. Mich. Jan. 25, 2010), the U.S. District Court for the Eastern District of Michigan discussed Ritten's prior whistleblower lawsuit brought under EMTALA, noting that it had been "dismissed as time-barred under EMTALA's two-year statute of limitations." In an earlier district court case, *Lopes v. Kapiolani Medical Center for Women & Children*, 410 F. Supp. 2d 939, 947 (D. Haw. 2005), the plaintiff brought suit under EMTALA alleging retaliation under the whistleblower provision of EMTALA (as well as an analogous state law). The court noted that "EMTALA establishes a two year statute of limitations, from the date of the alleged violation, for actions brought under the act." *Id.* at 952 n.15.

The case I find most persuasive is *Fotia v. Palmetto Behavioral Health*, 317 F. Supp. 2d 638 (D. S.C. 2004). In *Fotia*, the plaintiff worked for the defendant as an emergency assessment worker. *Id.* at 640. Following his assessment of a suicidal patient, Fotia determined that the patient needed to be hospitalized. The Palmetto Needs Assessment department informed Fotia that Palmetto had a bed and was suitable for the patient. *Id.* at 640-41. However, according to the plaintiff, the on-call administrator told him that Palmetto had taken its share of unfunded patients lately and directed Fotia to take the patient to another hospital. *Id.* at 641. Fotia took the patient to the other hospital and explained that he brought the patient there because he was told by the administrator that Palmetto had

13

taken its fair share of unfunded patients. *Id.* He contended that this constituted reporting of a violation of EMTALA. *Id.* One week after the incident, Fotia was fired. *Id.* He was told the reason for his termination was related to complaints from doctors and administrators, but before being fired, Fotia had not heard about any complaints against him. *Id.* He sued under EMTALA alleging retaliation for reporting the violation. *Id.*

Palmetto moved to dismiss Fotia's complaint, alleging, among other things, that there was no private right of action for retaliation under EMTALA. *Id.* at 642. The court rejected the defendant's argument. *Id.* at 642-43. First, the court found that just because EMTALA does not give individuals the right to bring suit for financial losses does not mean that whistleblowers have no private right of action, noting that "[s]uch a result would seem to contradict the very purpose of having a whistleblower provision." *Id.* at 642. The court also noted that Fotia, like Dr. Muzaffar, also sought damages for humiliation (Fotia also sought damages for pain and suffering and embarrassment). *Id.* Second, and most important here, the court found that a whistleblower does have a private right of action under EMTALA. It explained:

> Given the express language of 42 U.S.C. § 1395dd(i) and § 1395dd(d)(2)(A), it appears that the intent of the statute is to allow private individuals harmed by EMTALA violations to sue the hospitals that caused the harm. Section 1395dd(d)(2)(A) creates an explicit right of action for harmed individuals, and § 1395dd(i) establishes that whistleblowers are not to be "penalized" and subjected to "adverse action." Thus, as a whistleblower alleging retaliation, the very graveman of Plaintiff's complaint is that he has been harmed by a violation of EMTALA. Under the plain language of § 1395dd(i), Plaintiff should therefore have a private right of action.

*Id.* at 643.

14

In other words, it is the reading of § 1395dd(d)(2)(A) and § 1395dd(i) together that establishes a private right of action for whistleblowers. The language of § 1395dd(i) does not expressly create that private right of action. Without reading § 1395dd(d) alongside the whistleblower provision, Dr. Muzaffar would not have a cause of action. Dr. Muzaffar, therefore, cannot rely on reading the statute as a whole to establish a cause of action and then ask the court to read the subsections separately to determine the applicable statute of limitations. Accordingly, reading the two provisions together, I find that the two-year statute of limitations found in § 1395dd(d)(2)(C) applies to Dr. Muzaffar's retaliation claim.

2. *Dr. Muzaffar's Claims*

Having found that the two-year statute of limitations applies to EMTALA's whistleblower provision, I turn to Dr. Muzaffar's claims. Dr. Muzaffar filed his complaint on June 28, 2013; therefore, with the two year statute of limitations, the actions that led to his claims must have occurred on or after June 28, 2011. Dr. Muzaffar's principle claim of retaliation is the disciplinary action taken by the Medical Executive Committee of July 1, 2010 and July 8, 2010. Any claim of retaliation based on the Committee's July 2010 actions is therefore barred by the statute of limitations.

Dr. Muzaffar also argues that Aurora retaliated against him when it denied him access to Aurora Epic in April 2013. He seems to argue that the denial of access to Aurora Epic was retaliatory both as an act in and of itself and as the result of Aurora's alleged termination of his membership in the Aurora Health Network, Inc. Under either theory, Dr. Muzaffar cannot defeat summary judgment.

In assessing retaliation claims under EMTALA, courts apply Title VII jurisprudence. *See Lopes*, 410 F. Supp. 2d at 947; *Elkharwily v. Mayo Holding Co.*, 955 F. Supp. 2d 988, 995-

15

96 (D. Minn. 2013); *Ritten v. Lapeer Regional Medical Center*, 611 F. Supp. 2d 696, 715-16 (E.D. Mich. 2009); *O'Connor v. Jordan Hosp.*, No. , 2013 WL 3105647, *6 (D. Mass. June 17, 2013). A plaintiff can establish discrimination in violation of Title VII using either the direct or indirect method of proof. *Johnson v. General Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 727 (7th Cir. 2013).The direct method requires that the plaintiff provide direct or circumstantial evidence of the employer's discriminatory animus. *Id.* The indirect method, by contrast, requires the plaintiff to follow the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 728. Under the *McDonnell Douglas* framework, after the plaintiff makes a *prima facie* case of discrimination, the burden shifts to the employer to articulate a legitimate non-discriminatory reason for its action. *Id.* Doing so shifts the burden back to the plaintiff to show that the employer's proffered reason is pretext, which then permits an inference that the employer's real reason was unlawful. *Id.*

Under either method, Dr. Muzaffar cannot meet his burden of proof. Dr. Muzaffar alleges that his membership in the Aurora Health Network, Inc. was terminated in 2010 in retaliation for his reporting of EMTALA violations. This retaliatory termination, he alleges, resulted in the denial of application for access to Aurora Epic in 2013. (*See* Docket # 139 at 8-9 and Docket # 113 at 5-7.) He relies on a theory of "continuing discrimination" to overcome the two-year statute of limitations, citing *Stewart v. County of Brown*, 86 F.3d 107, 111 (7th Cir. 1996), *Selan v. Kiley*, 969 F.2d 560, 564-65 (7th Cir. 1992), and *Terry v. Bridgeport Brass Co.*, 519 F.2d 806, 808 (7th Cir. 1975). A plaintiff can rely on a theory of continuing discrimination if he can show that the two acts "are 'related enough to constitute a continuing violation.'" *Stewart*, 86 F.3d at 111 (internal citation omitted). If so, "courts

16

treat such a combination as one continuous act that ends within the limitations period." *Selan*, 969 F.2d at 564.

Dr. Muzaffar cannot show that the alleged termination from the network is "related enough" to the denial of his Aurora Epic application so as to be one "continuing violation." This is so because even if Aurora did unilaterally terminate him from his membership in the Aurora Health Network, that termination is not what caused the denial of his application for access to Aurora Epic. It is uncontroverted that in order to obtain Epic, a physician had to belong to the Aurora Accountable Care Network. Though he attempts to avoid this fact by calling it the "Aurora Network," the evidence demonstrates that there were different networks at various times, and Dr. Muzaffar has never belonged to the Aurora Accountable Care Network.

Even casting the denial of access to Aurora Epic as a new violation (and therefore within the statute of limitations), Dr. Muzaffar cannot meet his burden of proof. He states that he applied to become a member of the Aurora Accountable Care Network in order to obtain access to Aurora Epic but that his application was denied by a "South Region Supervisor" and members of the "South Region Physician Cabinet," explaining there was a moratorium on adding physicians to the Aurora Accountable Care Network. (Docket # 113 at 8.) Dr. Muzaffar argues that there is evidence of retaliation as he was never told why there was a moratorium, why he could not reapply for five years, and because Aurora cannot or did not identify the supervisor or members of the physician cabinet. (*Id.*) His theory, then, is that one of these people served on the Medical Executive Committee and chose to deny his application for retaliatory reasons. (Docket # 139 at 3.) In the fact secion of Dr. Muzaffar's brief, it states:

17

> The decision to reject Dr. Muzaffar's membership application was made even though Aurora was unable to identify the South Region Supervisor or any members of the Physician Cabinet that made the decision to reject Dr. Muzaffar's application to the network. [] It is possible that some members of the Physician Cabinet could also have been members of the Medical Executive Committee that disciplined Dr. Muzaffar, but that is not known at this time.

(Docket # 139 at 3.)

As a preliminary matter, I note that Dr. Muzaffar has never pled in any iteration of his complaint that the denial of his application to become a member of the Aurora Accountable Care Network (rather than the denial of his application for Aurora Epic) was part of his retaliation claim.[3] *See, e.g.*, *Auston v. Schubnell*, 116 F.3d 251, 255 (7th Cir. 1997) (explaining that summary judgment "is too late in the day to be adding new claims."); *Teall v. City of Chicago*, 986 F. Supp. 1098 (N.D. Illinois 1997) ("It is well settled in the Seventh Circuit that a plaintiff cannot amend his complaint with a later filed [summary judgment] brief."). Even so, he has offered nothing more than conjecture. As the Seventh Circuit has stated, "mere speculation and conjecture will not defeat a summary judgment motion." *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003) (internal citation and quotations omitted). And to the extent that Dr. Muzaffar is alleging that the person reviewing his application for Aurora Epic may have known about his disciplinary history with the Medical Executive Committee, it is undisputed that this person did not. (DPFOF 2 at ¶ 17.)

In sum, Dr. Muzaffar cannot defeat summary judgment. As the Seventh Circuit has said, "[s]ummary judgment is the 'put up or shut up' moment in a lawsuit." *Siegel v. Shell Oil*

---

[3] I also note that Dr. Muzaffar makes several arguments regarding a patient named R.C. However, like his arguments about the Aurora Accountable Care Network, these allegations were never pled in a complaint. Though R.C. is discussed in the proposed third amended complaint, I denied the motion for leave to amend. (Docket # 88.) Therefore, Dr. Muzaffar may not make arguments about R.C. to overcome summary judgment. Even so, his allegations about R.C. do not change the fact that he was never a part of the Aurora Accountable Care Network, of which he had to be a member in order to obtain Epic.

18

*Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). Dr. Muzaffar's retaliation claims that are based on actions of the Medical Executive Committee in 2010 are barred under the applicable statute of limitations. As for his claims that relate to Aurora Epic, Dr. Muzaffar has not produced enough evidence such that a rational jury could find that he was denied access to Aurora Epic in retaliation for his reporting of EMTALA violations. Therefore, Aurora is entitled to summary judgment on Dr. Muzaffar's claims and the case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment regarding the statute of limitations (Docket # 70) is **GRANTED**. The defendant's remaining motions for summary judgment (Docket # 73, 81, and 84) are **DENIED AS MOOT**.

**IT IS ALSO ORDERED** that the parties' motions to exclude expert testimony (Docket # 90, 92) are **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**. The Clerk of Courts is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of November, 2015.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge